UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

KEITH YAMAGUCHI,

Plaintiff,

v.

ATLANTIS CASINO RESORT, and DOES I-X,

Defendants.

Case No. 3:18-cv-00173-LRH-CBC

ORDER

Defendant, Atlantis Casino Resort ("the Atlantis"), motions this court for summary judgment. ECF No. 22. Plaintiff, Keith Yamaguchi, opposed the motion (ECF No. 39), and defendant replied (ECF No. 40). The court now grants defendant's motion for summary judgment. Because the court grants summary judgment for defendant, their pending motions in limine (ECF Nos. 23 & 24) are denied as moot.

**I.  BACKGROUND**

Plaintiff initially began working at the Atlantis Steakhouse ("the Steakhouse") as a server in July 2000. ECF No. 22-10 at 16. During this time, Ali Sarsangi was the assistant maître d' or manager of the Steakhouse and Frank Perez was the manager and plaintiff's immediate supervisor. ECF No. 39-1 at 8; ECF No. 39-2 at 9-10. Also, during this time, plaintiff and Mr. Sarsangi lived together for approximately seven months. ECF No. 39-1 at 8. Plaintiff was terminated from the Steakhouse by Mr. Perez on April 28, 2001 for being a "no call no show" to his assigned shift. ECF No. 22-10 at 16; ECF No. 39-1 at 8-9. Mr. Sarsangi then helped plaintiff get a new job at the Silver Legacy. ECF No. 39-1 at 10. Mr. Sarsangi and plaintiff remained friendly during the

1

approximately 10 years that plaintiff did not work for the Atlantis, and plaintiff testified that Mr. Sarsangi did not call him derogatory names during this time. *Id.* at 10-12.

In 2011, when plaintiff decided he wanted to go back to serving, Mr. Sarsangi helped plaintiff get rehired at the Steakhouse, where Mr. Sarsangi was now the room manager. *Id.* at 11; ECF No. 39-2 at 10; 14. Starting almost immediately when plaintiff returned to work at the Atlantis, Mr. Sarsangi began calling plaintiff "Chinaman," and referring to his and Quetking "Alan" Yongkanchung's sections in the back of the restaurant as "China." ECF No. 39-1 at 12; ECF No. 39-7 at 7. Plaintiff told Mr. Sarsangi that he did not want to be called "Chinaman;" however, Mr. Sarsangi continued to use the name and did so in front of other team members who also began using the name. ECF No. 39-1 at 12; 14. Plaintiff testified that after a busser began calling him "Chinaman," he asked Mr. Sarsangi to "nip that in the bud." *Id.* at 14. Plaintiff believed that after he complained, Mr. Sarsangi began giving him less work. *Id.* Defendant disagrees, asserting that plaintiff's records show his hours increased during his employment. *See* ECF No. 40 at 2.

In 2015, when Aspi Warden began as the Assistant Food and Beverage Director, plaintiff complained to him that he was "having problems with racial slurs." *Id.* Mr. Warden indicated to plaintiff that he would talk to Mr. Sarsangi, but plaintiff never heard anything further. *Id.* at 14; 16. Mr. Warden declared that he was never told about such racial discrimination and had never witnessed such acts by Mr. Sarsangi. ECF No. 22-2 at 5-6.

In March 2016, plaintiff refused to tip out a bartender according to the Steakhouse's tipping policy because he believed that she had already been tipped by the customer directly. ECF No. 39-1 at 17. Plaintiff was verbally counseled and given a one-day suspension. ECF No. 22-9. Plaintiff testified that after his suspension he spoke with Heather Kinnear from personnel to explain that he believed the tip policy was against the law and to complain about this suspension. ECF No. 39-1 at 18; 35. Plaintiff also testified that prior to making the complaints regarding the tip issue, he complained to Ms. Kinnear regarding the "Chinaman" slur because he "wasn't getting anywhere" with Mr. Sarsangi or Mr. Warden. *Id.* at 19-20. He testified that he filled out a form and wrote

down the situation and gave it to Ms. Kinnear. *Id.* at 20. Ms. Kinnear declared that she had no knowledge of such complaint and she found none in his personnel file. ECF No. 22-2 at 3-4.

On March 29, 2017, plaintiff was given two disciplinary write-ups. ECF Nos. 22-4 & 22-5. The first was from March 25, 2017, where plaintiff was disciplined for failing to attend a mandatory team meeting. ECF No. 22-5. The second was from March 29, 2017, when without Mr. Sarsangi's approval, plaintiff switched tables with another server, for which he was suspended for three days. ECF No. 22-4. Plaintiff also testified that when Mr. Sarsangi gave plaintiff these writeups, he told plaintiff that if he got any more infractions, he would be terminated. ECF No. 39-1 at 23. After receiving these writeups, plaintiff "felt pressure like, okay, management is trying to get me out of the door, to quit. . . . They are trying to get me out the door because I made complaints." *Id.* at 16. The record shows that plaintiff did not provide any comments on either of these write-ups. ECF Nos. 22-4 & 22-5.

On April 5, 2017, plaintiff believed he was having a heart attack and went to the hospital. ECF Nos. 22-6 & 39-1 at 20, 23. While it turned out to be stress related heart pain, plaintiff remained on medical leave until May 2, 2017. ECF No. 39-1 at 23; 38. Plaintiff testified that he believed his stress was because he had received two "bogus writeups," and he felt like they were "trying to push me out the door." *Id.* at 20. According to the emergency room doctor's notes, plaintiff indicated to the doctor that his stress was due to concern regarding his wife's health. ECF No. 22-6. Plaintiff returned to work on May 2, 2017, and has since not had any more heart related stress pains or incidents. ECF No. 39-1 at 20.

Plaintiff testified that when he came back from this leave of absence on May 2, Mr. Sarsangi said, "Look, Chinaman is back," during pre-shift in front of the crew. *Id.* at 20. After working a full shift that evening, plaintiff attempted to clock out at 10:30 p.m. but the time clock read "invalid ID." *Id.* at 38. When he arrived at work the following day, May 3, and attempted to clock in, the time reader indicated "invalid card." *Id.* at 38. Plaintiff testified that he attempted to reach Mr. Sarsangi, but he was in a meeting. *Id.* at 38-39. He also attempted to call "Ms. Erin" from personnel who also did not respond. *Id.* He then asked co-worker Christina Subillage to inform Mr. Sarsangi what was going on. ECF No. 39-9 at 21. She confirmed that she relayed a

message, but she couldn't remember whether she told him plaintiff would be late or had to go somewhere. *Id.* Plaintiff, believing that he was terminated based on the failure of the card reader, and after he could not reach any superiors, left the property and did not work his assigned shift. ECF No. 39-1 at 21. Plaintiff was then marked as a no call no show. ECF No. 22-10 at 17.

Plaintiff heard back from personnel the next day; plaintiff testified that they told him he was not terminated, and that he could return to work. ECF No. 39-1 at 21. On May 4, when plaintiff came in to work his assigned shift, he was informed by Mr. Sarsangi that he was being terminated for being a no call no show the previous day. *Id.* at 26.

On May 5, 2017, plaintiff filled out a form with human resources alleging racial discrimination and workplace harassment. ECF 22-7 at 2. On May 6, plaintiff sent two emails to himself which he then printed and gave to personnel on May 9, in which he complained of racial discrimination, hostile work environment, and retaliation. ECF No. 22-8. Plaintiff was officially terminated on May 12, 2017. ECF No. 39-14. During this meeting, plaintiff became aware his personnel file contained none of the previous complaints he believed he had made. ECF No. 39-1 at 20. Plaintiff was unemployed for approximately 2 months before he began working for the Eldorado, where he is currently employed as a server at La Strada. *Id.* at 4.

Plaintiff filed his charge with the Nevada Equal Rights Commission on May 23, 2017. ECF No. 39-12. He was issued a Notice of Right to Sue from the United States Equal Employment Opportunity Commission on January 25, 2018. ECF No. 39-13. Plaintiff then filed his Complaint in this court on April 24, 2018,[1] (ECF No. 1), to which defendant answered on May 4, 2018, (ECF No. 6). Discovery closed in this matter on December 31, 2018. ECF No. 20. Defendant then filed the pending motion for summary judgment (ECF No. 22), to which plaintiff responded (ECF No. 39), and defendant replied (ECF No. 40).

///

///

///

---

[1] The court finds that the Complaint was filed within the required 90-day time period following the issuance of the Notice of Right to Sue.

4

## II. LEGAL STANDARD

**Motion for Summary Judgment Pursuant to Civil Procedure Rule 56**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quotation and citation omitted); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient" to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

///

## III. DISCUSSION

Plaintiff's Complaint alleges two causes of action: the first for racially hostile work environment and discrimination, and the second for retaliation. ECF No. 1. The Atlantis moves for summary judgment on both. The court shall address each in turn below.[2]

### A. Defendant's motion for summary judgment on plaintiff's first cause of action, racial discrimination, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, is granted.

Under Title VII, it is an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. The legal framework for evaluating such claims, established by *McDonnell Douglas Corp. v. Green*, provides for three stages: first, the employee must establish his prima facia case of racial discrimination. 411 U.S. 792, 802-804 (1973). "The burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. If the employer does so, the plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Chuang v. Univ. of Cal. Davis, Bd. Of Trustees*, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (internal citation omitted). "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Id.* at 1124.

        i.   <u>Plaintiff has established his prima facie case.</u>

To establish a disparate treatment claim for racial discrimination under Title VII, "the plaintiff must first show that (1) he belongs to a protected class; (2) he was qualified for the

---

[2] Defendant argues that plaintiff alleged claims for age discrimination. However, plaintiff's Complaint (ECF No. 1) is void of any such allegation—the only reference to age discrimination appears in his prayer for relief requesting any "other relief, including an injunction to compel Defendant to adopt and enforce a policy against *sexually* hostile work environments and/or *age discrimination*." *Id.* (emphasis added). Plaintiff, in his response brief, indicates that he has not made an allegation of age discrimination and does not address any such claim of age discrimination in his opposition. *See* ECF No. 39 at 5 n.1. Therefore, the court shall not address the merits of an age discrimination claim.

position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Id.* at 1123. "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). In accordance with Federal Rule of Civil Procedure 56, the court must evaluate the evidence in the light most favorable to the plaintiffs. *See Chuang*, 225 F.3d at 1124.

Defendant concedes that plaintiff has established his prima facie case. *See* ECF No. 22 at 9. The court agrees. Plaintiff is a member of a protected class—he is of Japanese descent. He was qualified for the position—the record provides that he was the second highest tip earning server at the Steakhouse and was repeatedly requested. Mr. Sarsangi testified that plaintiff was a good server, and that guests would tell him that plaintiff was the "Best server we ever had. We love him, we want to take him home with us. We can't wait until we come back next time. You are lucky to have him." ECF No. 39-2 at 25. He suffered an adverse employment action—he was terminated from his position. And other individuals outside the class were treated more favorably—other servers, not of Japanese descent, were not subjected to discriminatory, or racially derogatory name calling. From this evidence, it is clear that plaintiff has established his prima facia case.

      ii.    <u>Defendant has adequately presented a nondiscriminatory reason for plaintiff's termination</u>.

The burden now shifts to the defendant to provide a racially neutral reason why plaintiff suffered the adverse employment action. Defendant provides that plaintiff was disciplined several times during his employment at the Steakhouse. In March 2016, plaintiff refused to tip out a bartender according to the Steakhouse's tipping policy, he was verbally counseled, and given a one-day suspension. ECF No. 22-9. In March 2017, plaintiff was given two disciplinary write-ups: the first for failing to attend a mandatory team meeting, (ECF No. 22-5), and the second for switching tables with another server without Mr. Sarsangi's approval, (ECF No. 22-4). After this disciplinary action, Mr. Sarsangi informed plaintiff that another infraction would result in his termination. ECF No. 39-1 at 23.

On May 3, 2017, plaintiff was a no call no show for his shift. While the facts surrounding why plaintiff did not work his assigned shift differ between the parties, plaintiff agrees he did not work on the day in question, and that he personally never informed Mr. Sarsangi that he would not be at work. Mr. Sarsangi, having not been informed that plaintiff would not be at work, marked plaintiff as a no call, no show. Due to this no call no show, plaintiff was informed he was terminated on May 4. The court finds that this reason is racially neutral and nondiscriminatory.

       iii.    <u>Plaintiff has failed to persuade the court that defendant's nondiscriminatory reason was mere pretext.</u>

The burden now shifts back to the plaintiff to show that defendant's proffered reason was mere pretext for his termination. A plaintiff can persuade the court that he was a victim of intentional discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. "[A] disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons." *Chuang*, 225 F.3d at 1127. However, "[w]here evidence of pretext is circumstantial, rather than direct, the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1113 (9th Cir. 2011) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)).

The court is not persuaded that a discriminatory reason motivated defendant to terminate plaintiff. Plaintiff argues that his termination was pretextual because he had complained of racial discrimination prior to his termination and this motivated defendant to terminate him. However, nothing in the record supports such a conclusion. Plaintiff testified that he complained about Mr. Sarsangi calling him "Chinaman" numerous times: in 2011 plaintiff complained to Mr. Sarsangi himself, asking him to refrain from using the language; in 2015 to Mr. Warden; in 2016 to Ms. Kinnear; and again to her in 2017 after Mr. Sarsangi told plaintiff he was terminated. Taking plaintiff's testimony in the light most favorable to him, the last time plaintiff complained

8

about racial discrimination, specifically about being called "Chinaman," was sometime before March 2016, over a year prior to his termination. Additionally, his complaints in 2017 were made after plaintiff was informed of his termination by Mr. Sarsangi. Therefore, the court does not consider this direct evidence of a discriminatory reason for his termination.

Likewise, plaintiff has provided no circumstantial evidence of pretext. Plaintiff argues that the defendant's proffered reason, no call no show, is unworthy of credence because there is a dispute as to the circumstances surrounding the event. Plaintiff testified that when his card would not clock him in, he attempted to reach Mr. Sarsangi and personnel. He also testified that he informed a co-worker Christina Subillage that he could not clock in and to let Mr. Sarsangi know. Ms. Subillage confirmed that she relayed the message to Mr. Sarsangi, but she could not remember if plaintiff told her he was going to be late or was going somewhere. ECF No. 39-9 at 21. Evaluating this evidence in the light most favorable to him, plaintiff confirmed that he did not attend work on May 3, 2017. Further, even if Ms. Subillage did inform Mr. Sarsangi that plaintiff was going somewhere or was going to be late, she did not testify that she informed him plaintiff would not work at all, which is what transpired and led to the no call no show. Because plaintiff has pointed the court to no circumstantial evidence of pretext, his claim of racial discrimination under Title VII fails, and the court must grant defendant's motion as to this portion of plaintiff's first cause of action.

**B. Defendant's motion for summary judgment on plaintiff's first cause of action, racially hostile work environment, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, is granted.**

Although not explicitly included in the text of Title VII, claims based on a hostile work environment fall within Title VII's protections. *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). "To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v.*

*County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).[3] "To determine whether conduct was sufficiently severe or pervasive to violate Title VII, we look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted). "[T]he work environment must be both subjectively and objectively be perceived as abusive." *Id.* (internal quotation marks omitted). *See also Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.").

First, a genuine issue of triable fact exists as to whether plaintiff was subjected to conduct because of his race or national origin; specifically, whether plaintiff was called the racially derogatory name, "Chinaman." Defendant offered a number of declarations disputing this factual allegation: the declaration of Jose Anguiano, an expeditor at the Steakhouse, who declared that he never witnessed any ethnic or racial discrimination or harassment at the Steakhouse, and had never heard anyone call another employee "Chinaman" or any other derogatory name (ECF No. 22-2 at 7); the declaration of Bradley Bourdase, a busser at the Steakhouse, who declared that he had never witnessed any ethnic or racial discrimination or harassment at the Steakhouse or heard any name calling, or heard any other derogatory names used (ECF No. 22-2 at 8); the declaration of Kendell Schoen, a server at the Steakhouse, who declared that she never witnessed any ethnic or racial discrimination or harassment at the Steakhouse, never heard any name-calling, and never heard anyone call another employee 'Chinaman" or any other derogatory names (ECF No. 22-2 at 9); and the deposition testimony of Mr. Sarsangi that he never called plaintiff "Chinaman," or referred to his section as "China" (ECF No. 39-2 at 29).

Plaintiff, in response, provided the deposition testimony of several individuals: John Sanchez, the former dining room captain at the Steakhouse, who testified that he frequently heard Mr. Sarsangi call plaintiff "Chinaman," refer to plaintiff's and Quetking "Alan" Yongkanchung's

---

[3] "Because the elements to prove a hostile work environment are the same for both racial harassment and sexual harassment, cases analyzing both types of harassment are relevant to our analysis." *Id.*

section as "China," and that this happened in front of other employees (ECF No 39-6 at 7; 21-23); Kathia Berumen, testified that while she was employed as a server at the Steakhouse, she thought she remembered hearing the term "Chinaman" used at least once, but could not remember who it was directed toward or who said it (ECF No. 39-5 at 21-23); plaintiff's own testimony that he was repeatedly called "Chinaman" by Mr. Sarsangi and other team members (*see* ECF No. 39-1); and his wife's testimony that she heard Mr. Sarsangi call her husband "Chinaman" at a BBQ outside of work (ECF No. 39-4 at 8). From this evidence, it is clear to the court that there is an issue of fact as to whether plaintiff was subjected to discriminatory conduct of a racial nature.

Second, if plaintiff was subject to such conduct, it is clear that it was unwelcome. Plaintiff testified that he did not like or appreciate the name calling. He testified that he repeatedly reported the conduct: he asked Mr. Sarsangi to stop, he reported the conduct up the chain of command to Mr. Warden and to Ms. Kinnear in personnel. Plaintiff repeatedly told his wife of the conduct and that it was unwelcome. Plaintiff testified that the connotation he felt regarding being called "Chinaman" was not on the level of a "nickname," but more akin to being called "Jap or Nip." ECF No. 39-1 at 24. While Mr. Warden and Ms. Kinnear both dispute that such conduct was reported to them, it is still clear that such conduct was unwelcome.

Finally, while subjectively plaintiff believed his work environment was abusive, the court cannot find that the conduct in this case was sufficiently severe and pervasive to find that it was objectively abusive. Taking plaintiff's evidence in the light most favorable to him, he was called "Chinaman" frequently over an approximately 6-year period. However, the record provides that such name calling was a mere utterance, and not physically threatening. Additionally, nothing in the record shows that this name calling unreasonably interfered with his work performance. Further, the precedent does not support such a finding. In *Vasquez*, the Ninth Circuit considered the alleged conduct—a higher ranked employee telling plaintiff that he had "'a typical Hispanic macho attitude,' and that he should consider transferring to the filed because 'Hispanics do good in the field,'"—in light of its prior rulings in Title VII cases. *Vasquez*, 349 F.3d at 643 (citing *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1036 (9th Cir. 1990) (in which the Court "held that no reasonable jury could have found a hostile work environment despite allegations that the

employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino."). *See also Manatt v. Bank of America, NA*, 339 F.3d 792, 795-96, 798-99 (9th Cir. 2003) (concluding that the conduct of plaintiff's coworkers—calling plaintiff "China woman," pulling "their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians," and mocking plaintiff's pronunciation of words, among other things—"while offensive and inappropriate—did not so pollute the workplace that it altered the conditions of her employment," and therefore, her hostile work environment claim failed). *Compare to Kang v. U. Lim America, Inc.*, 296 F.3d 810, 814, (9th Cir. 2002) (concluding the alleged conduct—the employer calling plaintiff "stupid," "cripple," "jerk" "son of a bitch," and "asshole," and physically striking plaintiff "in the head with a metal ruler on approximately 20 occasions, kicking him in the shins, pulling his ears, throwing metal ashtrays, calculators, water bottles, and files at him, and forcing him to do 'jumping jacks,'"—was objectively offensive such that a reasonable person would find it hostile or abusive.).

The court does not condone Atlantis employees using the racially derogatory name, "Chinaman," toward plaintiff, and finds such conduct wholly offensive and completely inappropriate. However, if the conduct articulated in *Vasquez*, *Sanchez*, and *Manatt*, as a matter of law, was not enough to rise to the level of hostile work environment, the court cannot find that the conduct in this case rises to the level of an objectively abusive work environment. *See Vasquez*, 349 F.3d at 643; *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal citation omitted) (as the Supreme Court "pointed out in *Meritor*, 'mere utterances of an . . . epithet which engenders offensive feelings in [an] employee,' does not sufficiently affect the conditions of employment to implicate Title VII."). While the other elements of plaintiff's cause of action present triable issues of fact, this element does not: plaintiff has failed to show that the conduct in this case was sufficiently severe and pervasive to be objectively abusive. Therefore, the court must grant defendant's motion for summary judgment as to this portion of plaintiff's first cause of action.

**C. Defendant's motion for summary judgment on plaintiff's second cause of action, retaliation under Title VII, is granted.**

Under Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . *because* [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or *because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added). "To succeed on a retaliation claim, a plaintiff must first establish a prima facie case": (1) that he engaged in a protected activity, (2) that he subsequently experienced an adverse employment action, and (3) "that a causal link exists between the two." *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988) (internal quotations omitted). Successful Title VII retaliation claims must "be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m)," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing cases that indicate both a 3 month and 4 month period between the protected activity and adverse employment action is insufficient to establish causality).

Plaintiff has established the first element of his prima facie case—he engaged in a protected activity when he complained about Mr. Sarsangi calling him "Chinaman." Plaintiff has also established the second element—he experienced an adverse employment action when he was terminated. However, plaintiff has failed to establish the causal link between the two; that but for these complaints, he would not have been terminated.

Plaintiff testified that he complained to Mr. Warden regarding being called "Chinaman," in 2015. Plaintiff also testified that before his March 2016 suspension and discipline regarding failing to tip a bartender, he complained to personnel regarding Mr. Sarsangi calling him

13

1 "Chinaman." These complaints fail to establish the causal link: his 2015 complaint occurred approximately 2 years prior to his ultimate termination, and his March 2016 complaint, though unclear exactly when this complaint was made, occurred at least 14 months prior to his termination. *See Breeden*, 532 U.S. at 273 ("Action taken . . . 20 months later suggest, by itself, no causality at all.").

Plaintiff testified that he then complained to personnel regarding Mr. Sarsangi's behavior in May of 2017. First, on May 5, 2017, plaintiff filled out a form with human resources alleging racial discrimination and workplace harassment. ECF 22-7 at 2. Then, on May 6, plaintiff sent two emails to himself that he printed and gave to personnel on May 9, in which he complained of racial discrimination, hostile work environment, and retaliation. ECF No. 22-8. These complaints also fail to establish the causal link: while the complaints occurred before his official termination date, May 12, 2017, both occurred after May 4, when Mr. Sarsangi articulated to plaintiff that he was terminated for being a no call no show for his May 3 shift.

Finally, there is no evidence that Mr. Sarsangi had any knowledge of plaintiff's prior complaints when he told plaintiff he was fired on May 4. *See* ECF No. 22-2 at 10 (Mr. Sarsangi declared that when he terminated plaintiff, he was not aware that plaintiff had made any complaints of harassment, discrimination, or retaliation, based on race, age or anything else); *Breeden*, 532 U.S. at 173 ("[T]here is no indication that Rice even knew about the right-to-sue letter when she proposed transferring respondent."). Therefore, even evaluating this evidence in the light most favorable to plaintiff, the court cannot find plaintiff has established a causal connection between his complaints and his ultimate termination. Accordingly, the court grant's defendant's motion for summary judgment as to plaintiff's second cause of action.

///

///

///

///

///

///

14

**IV. CONCLUSION**

IT IS THEREFORE ORDERED that defendant's motion for summary judgment (ECF No. 22) is **GRANTED.**

IT IS FURTHER ORDERED that defendant's motions in limine (ECF Nos. 23 and 24) are **DENIED as moot**.

IT IS FURTHER ORDERED that the Clerk of Court is Ordered to enter judgment for the Atlantis.

IT IS SO ORDERED.

DATED this 27th day of September, 2019.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE